We'll hear argument now in Case 12-930, Mayorkas v. Cuellar de Osorio. Mr. Chief Justice, and may it please the Court, the Board of Immigration Appeals reasonably interpreted Section 1153H3 when it ruled that creation of a new petition by a new petitioner did not qualify as automatic conversion of an existing petition to an appropriate family-sponsored category. That interpretation is supported by the text and by the structure of the statutory scheme. Indeed, it avoids destabilizing that scheme by displacing waiting aliens who have long had qualifying relationships with lawful permanent residents, and putting ahead of them in line a large number of adults, aged out former derivative beneficiaries, who have only just obtained a relationship with someone who can sponsor a family member. But isn't the effect on the no longer child much more severe? I mean, if everybody has to get bumped down a little way, it will make a difference of months until they qualify for hearing. Your Honor, I don't accept the proposition that it would only make a difference of months, although I know Respondents have argued that. It depends how many people. It's not going to be 27 years. I'm sorry? It's not going to be 20 years. No, Your Honor. It won't be 20 years, but it could be years. And these people in the F2B line have already been waiting for years to get up to the front of that line. And I think it's a mistake to think of a derivative beneficiary as waiting in line and being entitled to credit for waiting in line for a couple of different reasons. First of all, the derivatives rights are, as the name suggests, completely derivative of the principal beneficiary's rights. If the principal beneficiary never becomes a lawful permanent resident, never crosses the border into this country, then the derivative gets nothing for the time that the principal beneficiary spent waiting in line. In addition, there are derivative beneficiaries who, under any understanding of what it means to wait in line, can't be conceived of as having waited, excuse me, for the time that the principal beneficiary has waited. And let me give you an example of that. In the F4 line, someone could be waiting in the F4 line as a principal beneficiary for, say, 15 years. And right as they're getting up to the front of that line. Scalia What's F4? For those of us who don't deal with this as much as you do. Saharsky I apologize, Your Honor. F4 is siblings of U.S. citizens. So they could be waiting in the F4 line for 15 years, let's say, as a principal beneficiary, and then just as they're getting up to the front of that line and their priority date is going to become current, they get married to somebody. And the person they get married to has a 17-year-old child at that point in time. That stepchild, that 17-year-old child under the definition of child in the statute will count as the principal beneficiary's child. And if, say, a year later, the principal beneficiary's priority date becomes current and that principal beneficiary is entitled to immigrate to the United States and become a lawful permanent resident, they're going to be able to bring that 17-year-old or at that point 18-year-old stepchild along with them as a derivative beneficiary. That stepchild did not wait in the line for the first 15 years that the principal beneficiary was waiting. And so that example, I think, shows why, when you look at a derivative beneficiary, you want to look at the end of the process, a snapshot in time of when the principal beneficiary is coming to this country. And what the statute says is, principal beneficiary, if at the moment you're coming, do you have a child who would be left behind in another country if you were to come without them? If so, bring them along. But it doesn't make sense to look at the derivative beneficiary from the very beginning of the process. Kennedy, you interpret automatic to include immediate. Well, I think that if automatically converted in the context of this statute, if that's triggered by a particular event, then it has to happen as a result of that event, yes. Alito, your reading of this statute gives H-3 a very, very narrow scope. Isn't that correct? And I just want to see if I understand exactly how narrow it is. It would apply to any employment-based or diversity-based petitions. No, Your Honor, it does not. It applies to an F-2A petition filed by a legal permanent resident on behalf of that person's spouse, right? And if that they have a minor child, then the minor child would be a derivative. Right. Beneficiary. Yes. It also would apply in a situation where an F-2A petition is filed for a child as the principal beneficiary and the child ages out of that status. But I'd also like to say that it doesn't actually apply to all aged-out F-2A derivative beneficiaries, so it's perhaps even slightly narrower than Your Honor has described. It applies to situations where there can be automatic conversion of the existing petition and movement into a new appropriate category without a change in the petitioner. And so for some of the reasons that I discussed before regarding stepchildren, it actually will be the case that some aged-out F-2A derivative beneficiaries You give me an idea of how, just to follow up on Justice Alito, can you, I don't know if you asked the IRS or the INS this question, but you may have, something like it. Let's look at all of the derivative beneficiaries in the Fs, F-1, 2A, 2B, F-3, F-4. And for the most part, they're grandchildren, they would be, or children, sometimes nephews and nieces. And now think of the set of all those people who age out, okay? They started out as children, but about 15 years later, when this thing got current, they're now aged out. Now, think of that set. It's called a certain size. What percent of that set do you think are accounted for by the F-2A people, who are the only ones on your interpretation, that 3 would apply to? I don't know what percentage. Any idea, any rough idea, because if you just look at it, one's natural instinct is just what Justice Alito said. This is a minuscule component of a set. It's much bigger. And therefore, it's just unlikely that Congress meant 3 to apply to a micro to a little molecule when there's the whole ocean. Now, that's the kind of argument that you're up against, I think. So I wanted to ask you that empirical question, if you can give me any idea of the empirical. Yes, Your Honor. Well, before I get to the question of the numbers, and I can give you some numbers, although not perfect numbers because of how records are kept in this area, I'd just like to say that keep in mind that what Congress was reasonably interpreted to be doing here is picking up on an existing regulation that was targeted specifically at this very group that we're talking about. I'm going to let you answer this question, but, yeah, they had a regulation, so why didn't they copy the regulation? It would have been much, much simpler to say this is limited to F2A beneficiaries than to write it the way they did and say this is to everybody who ages out. There are two reasons, I think, why they didn't copy the regulation. Answer him and then come back. Okay. With respect to the numbers, in our reply brief on page 18 in the footnote, we've given the best numbers that we were able to come up with, and they are not complete numbers about people who are aging out every year for as long as the State Department has been keeping records about this, which is not all that long. And you can see that there's a series of parentheticals there with respect to each year. The first number in the parenthetical represents age-out derivatives in the F2A category, and the second number represents aged-out derivatives in all family preference categories, including F2A. And the numbers for these F2A age-outs are not tiny. There are thousands of people a year and some years, you know, up in the 20,000s. And so it is not necessarily a minuscule number. Breyer, did you ask anything that would give me a hint? That's the total global picture. That's the 2,000, 3,000, sometimes 10,000 aging out. All right. But the real relevant thing is if we can get some idea, which seems on paper, that your interpretation applies only to a subset of those people. And just from reading it, but it's quantitative reading it, it sounds like a tiny subset of those people. Now, we can argue about whether that's for you or against you. I think it's against you. But nonetheless. Scalia, you do give the subsets. It's not just the general figure. Is it? There's, as I say, the first number is the F2A, aged-out F2A derivatives. That's F2A, but we want F2B, don't we? No, I think F2A is what's relevant. F2A, right, you're right. That's what's covered. And this is not a full universe of the numbers. These are numbers kept by the State Department, but the State Department is only responsible for half of the administration of this program. There are also people who adjust their status to lawful permanent resident in the United States, and those numbers just aren't kept. We tried to get them. Breyer, so it looks like it's between 10 percent and sometimes it gets up to 30 percent. It varies, Your Honor. And as I say, these numbers aren't perfect, but I think it gives you a sense of the universe that we're talking about here to the best of our ability. So if I could turn back to Justice Sotomayor's question about why they didn't just go ahead and copy the language of the regulation into the statute and why they didn't just say F2A in the statute, I think the reason gets back to what I was discussing earlier, actually, with Justice Alito, which is that actually would have been over-inclusive if they had just said F2A beneficiaries are covered, because there is a set of F2A derivative beneficiaries who don't benefit from the language of section 1153h3, because they are the child of the Petitioner's spouse, but they don't count as the child of the Petitioner, probably for a stepchild kind of situation like I was discussing earlier. If the stepchild is over 18 at the time of the marriage, they don't count as the stepparent's child under the statute. So there is a tiny corner here that would get carved out. And actually Congress did a very good job in this statute of capturing exactly the universe of people that was captured under the preexisting regulation. The preexisting regulation required there to be another petition filed by the same Petitioner, and automatic conversion to the appropriate category gets at exactly that same kind of result. The other reason I think why Congress might not have specified F2A in section 1153h3, in addition to just its understanding of automatic conversion as a term of art in this area that was doing the work that it wanted, is that section 1153h3 now functions smoothly if there is a change in the family-sponsored categories, which has happened in the past. Congress has changed up those categories, added categories, and so if, for instance, Congress were now to add a category for grandchildren of U.S. citizens, then aged-out F3 beneficiaries, like Respondents' sons and daughters, could automatically convert to an appropriate category, and section 1153h3 would work just fine. Alito, suppose there are two lawful permanent residents who are exactly the same, except that one has a minor child and one has an adult unmarried child. So the latter files an F2B petition and gets in line on a particular date, right? Then the former, the lawful permanent resident who has a minor child, files an F2A petition and gets in that line, but then by the time the date comes up, the child has aged out, and so now you would say that would be converted to an F2B petition. But the person would be, the child would be at a much lower point, right, than the first one. Why would Congress have wanted that? I don't think that's necessarily true. It would depend on how the priority dates were working between the when they were coming current in the different categories. I do think it's true that the aged out F2A individual would go into the middle or the back of the F2B line, the way that the priority dates are currently working out. Alito, and the other one would be higher up. Well, but they would, yes, I suppose that's true, but the person who ages out would be keeping the original priority date. So they are not entitled to more than that. And the reason Congress might have wanted to put people into the middle or back of the F2B line and not right up to the front of the F2B line, which would be the effect of Respondent's interpretations, is that that's extremely disruptive to the line. And I would like to spend a few minutes talking about that, because I think it's critically important here. It's a small category. Kagan Ms. Klootman, before you do that, could I just ask you to respond to a sort of different hypothesis of what Congress was up to here and tell me what, if anything, you think follows from it? Assume you think that Congress actually was not intending this very small category, that Congress was intending for this to be a pretty wide provision. But what Congress was, it was laboring under a misapprehension. I mean, it thought that you could do this kind of automatic conversion with respect to all of these people. And it turns out Congress was just utterly wrong on that. So, but Congress includes this language about automatic conversion. So what do I do if I basically have a hunch that that's what Congress was thinking, but yet the language that it adopted talks about automatic conversion, which is impossible for many of this category? Klootman I think it's the language that's on the face of the statute that's important, and it's ambiguous for the very reason that you just gave, which is that there are a lot of people for whom automatic conversion to the appropriate category just isn't  It's actually too unresponsive. Scalia Do you mean we can't correct congressional mistakes? Klootman No, but I think in a situation where the language is ambiguous, the agency is entitled to deference, and deference is particularly appropriate in this kind of circumstance. This Court has said before that deference is particularly appropriate in immigration context, and I think if any immigration context is appropriate for it, it's this one, because very delicate lines have to be drawn here. If someone is helped, someone else is hurt. And it's something where you have to step very carefully, otherwise there's going to be real destabilization of the system. And just before I turn to that, let me just say one more thing about what Congress was thinking. To the extent that you look at the legislative history here, there is no indication that Congress was thinking that this would sweep broadly. In fact, there are many statements on the floor about not wanting to displace people who are waiting in line, which would cut in the other direction. So the destabilization that would occur as a result of Respondent's interpretation would be many people, and we can't quantify exactly how many, but we have reason to think that the number is quite large, would come pouring into, in most cases, the very front of the F2B line, and would hold it up for very significant periods of time, and perhaps even freeze that line altogether. Keep in mind that in that line, there are only 26,250 visas available per year, nothing changes that, and per country, there are only about 1,800 visas available per year. So if you envision, say, 3,600 people from one country coming into the front of the F2B line, every single person in that line, that's at least hundreds of thousands of people, based on State Department numbers and more than that probably if you had the other numbers, is going to wait for two additional years. And if there are more people who come into the front of the line, all those people are going to wait longer. And the equities here are such that the people who are going to be pushed back really have entitlement to stay where they are, and that's for this reason. The people coming into the front of the line, the aged-out F3 and F4 derivative beneficiaries, have only just, just moments before this has happened, obtained some kind of qualifying relationship with a U.S. citizen or a lawful permanent resident that would entitle them to family-sponsored immigration prior to their parent, the principal beneficiary, becoming a lawful permanent resident. They were just the nieces, nephews, grandchildren of citizens and students. Kennedy, that's an expectation argument? I mean, I'm not trying to put words on your mouth, but is that the point you're making? Well, I think the idea is that the people who are going to be pushed back have had long-time relationships with a lawful permanent resident, entitling them directly to family-sponsored immigration. They've been waiting in the F2B line maybe for years. They've been separated from their parents for that entire period of time, most likely. And what Respondent's position would mean would be that these aged-out F3 and F4 derivative beneficiaries would basically experience no period of separation from their parents, because they would not have to be separated. Breyer, we don't have numbers on separation from parents. We do know that these people, the ones that would be caught on the broad interpretation, have also been waiting for years and years and years and years. They've all been waiting for years and years and years and years. And it becomes hard to choose among them. Well, I do think that there are sympathetic stories on both sides. You can find sympathetic stories all over the place. And I mean, all right, go ahead. I would say for the reason I gave earlier, though, I don't think it's right to think of derivative beneficiaries as themselves waiting in line. I really do think that that's the wrong way to look at the problem in this case. The reason that aged-out F2A derivative beneficiaries get the benefit of section 1153H3 is not that they've been waiting in line. It's that they themselves have a relationship to a lawful permanent resident that either did entitle them or would entitle them to be a principal beneficiary in their own right. Alito, is your real quarrel here with the idea of an appropriate category or with the automatic conversion? On the Respondent's view, why isn't there an automatic conversion? Because they say that as soon as the person ages out, they can be moved into another category. That sounds like it's automatic. I do think you have to look at the phrase as a whole, but I also don't think that that's what Respondents are arguing. They're arguing that why isn't it automatic? Well, I think it's not automatic because at the moment, let me step back and say I think there are two different problems with Respondent's position. One is the question of whether you can ever have automatic conversion to an appropriate category of an existing petition when you're subbing in someone new as the petitioner. So that's one issue. And then there's a separate issue. Alito, automatic just means something occurs without anybody having to initiate the change. That's true. So why isn't there an automatic here? Well, I think that with respect to the issue that I was just talking about, which is the question of whether you can ever convert a petition to a make a petition to buy something that's by a new petitioner, there is some action that's required. Do you have to go to the new petitioner, the parent, and say would you like to petition? Do you have to check that person? And keep in mind, they've never been checked at the beginning of this process when petitions are evaluated and approved to see if they qualify to be a petitioner. For instance, to be a petitioner, you can't have committed certain crimes against minors, and that will never have happened here. So if you have to stop and do that check at that stage as well, then it's starting to look a lot less automatic. Then there's a separate question, as I say, even if you did think that this statute could unambiguously be read to say that you can take a petition by someone's grandparent and make it into a petition by someone's parent, there's a separate timing question that the parties are disputing here as well and that the Board ruled on in its decision in Wong, and that is what is the moment when automatic conversion is supposed to take place? Respondent's argument is that it's supposed to take place at whatever time the derivative beneficiary is interviewed, essentially at the very end of the process. A consular interview or an adjustment of status interview or evaluation, and that that's when automatic conversion ought to happen. But what the Board said, and I think quite reasonably, is something different, which is the statute gives you a date, Section 1153h1, gives you a date as of which you are supposed to evaluate the derivative beneficiary's age, and that's the date that the visa number becomes available to a parent. Kagan's argument, but that's not the argument that Wang made, is it? Wang suggested that the appropriate date was at the very date of aging out. So it seems as though you shouldn't be entitled to Chevron deference on that question, given what Wang said about it. I don't think that's true, Your Honor. I think, as I read Wong in any event, that it says on page 33, you get automatic conversion if the beneficiary is 21 years or older pursuant to H1, and then later in the decision on page 35, it talks about the moment the beneficiary aged out, but that I take it to be referring back to the H1 determination that's been made. So it's aged out not biologically in the sense of turning 21 and celebrating your 21st birthday, but becoming 21 or over under H1 as of that date that the visa number becomes available to the parent. I think that's how Wang is best interpreted. There may be separate questions about whether people are entitled to the protections of H1, but those aren't being raised in this case, and that's not something that Wang itself ruled on. And so I do think that there's a reasonable reading of the statute that says, getting back to the question of automatically, the moment, the key moment, is the moment that you're evaluating the derivative beneficiary's age as of. And as of that date, they're either under 21 and they can be treated as a child for the rest of the process, or they're 21 or over and you've got to figure out what can you do with them. Can they be automatically converted to an appropriate category, or can they not? And if not, then they're out of luck. And that is a way of reading the statute that makes it a very smooth movement from one category to another without any kind of gap in eligibility, and it's a reasonable reading of the statute. So as I say, I think Respondents really do have two separate views. Breyer, what do we do from the reasonable reading of the statute? I looked at the Board's opinion here, and it seems to me in the two paragraphs just prior to section 5 at the end of section 4, they have as a critical step in their reaching their conclusion their belief that the legislative record demonstrates a clear concern on the part of Congress to ameliorate the delays associating with the process of the visa processing. And they say the same thing in paragraph just above that. So that's what they think this statute is about. But that statute, that problem is taken care of in 1B. And so the question would be if that problem, which subtracts all the days that there was a processing delay, is taken care of on 1B, they can't be right that that was the purpose of 3. So unless you can say to me how that could possibly be right, that reasoning, then what we should do, I guess, if we think that you have authority in the government to interpret this minor part of the statute, which I do, is Chenery, send it back. And maybe give them, say, you ought to do this again, because the reason you gave is not good. Why not? Anderson I don't think there's a problem with the reason they gave, and I would like to explain why. But even if there were a problem with the reason they gave, I don't think that it would be appropriate to send it back. And let me talk about each of those. With respect to the reasoning on the legislative history, the way that I read the board decision is totally consistent with my own reading of legislative history, which is to say that Congress's overwhelming concern and the thing that Congress talked about by far the most in the fairly sparse legislative history here, there's no pertinent report really, they're just a couple of days of debate, the thing that Congress talked about the most was the administrative delays. That was Congress's overarching concern. And Congress didn't really talk about H-3. They didn't really say what they were doing there. They didn't really say what they were getting up to. And so I think under those circumstances, the board is reasonable in saying it makes sense to think that what Congress was doing was not some kind of big change and deep destabilization of the whole immigrant visa system in the way that I described earlier. It was doing something pretty small, and it was taking an existing regulation and putting it into the statute, and by doing that, it could be certain that it wasn't going to cause disruption, it wasn't going to upset. Sotomayor, because I look at H-3, which talks about automatic conversion of battered spouses, of widowed spouses, and I think under your reading, you're basically saying Congress was not intending to let those people jump the line. Am I correct? No, Your Honor. Because you have to change names? No. Oh, there's automatic? There is automatic conversion for self-petitioners and their derivatives. It's provided for in a provision that preexisted the Child Status Protection Act, and very complete and total age-out protection is provided in that provision. So why did Congress need to add H-4? Using exactly the same language that it used for H-3. Well, Congress added that they were entitled to the same benefits of automatic conversion as H-3. Congress added H-4 a couple of years after the Child Status Protection Act, I think basically just to ensure that battered women, people who are subject to abuse, could get whatever benefit the Child Status Protection Act offered them, even though they already had this other very good protection that I'm talking about against ageing out in Section 1154a1, d1, 1, and 3. But in addition, it is possible to envision a situation where a self-petitioner could qualify under Section 1153h3. I don't know that anyone would ever go that route because they have this other provision that they can rely on, but if you think of a self-petitioner who is the child of an abuser, that's like an F2A. Sotomayor So you can have automatic conversion only in the situations that give you other statutes. If I could reserve the remainder of my time. Thank you. Roberts Thank you, counsel. Mr. Fleming. Fleming Mr. Chief Justice, and may it please the Court. The government began at step 2 of Chevron, but I would submit that this case can and should be resolved at step 1. The government is asking this Court to read the statute in a highly disfavored way such that it is not harmonious but at war with itself. And nothing in the language requires that. In fact, I would recommend that the Court turn to the back page of the government's brief where the statute is actually set forth. And we can see that Provision H3 consists of one sentence, and that sentence consists of two parts separated by a comma. Before the comma, the language sets forth one and only one eligibility criterion. After the comma, the language sets forth two things that shall be done if the eligibility criterion is satisfied. Now, importantly, the government does not contend that there is any ambiguity in the language before the comma. Everyone agrees that it contemplates and includes all derivative beneficiaries. There is no dispute about that. And a bedrock rule at the step 1 inquiry is that the Court reads the statute as a harmonious whole that goes double when we're talking about a single sentence. So if there is a possible reading of this sentence that is harmonious with the clear opening clause that applies to all derivative beneficiaries under step 1 of Chevron, that is the reading the Court gives to the statute. It's especially important here, because the precise question at issue in this case is a question of eligibility and scope. Who gets the benefit of the two benefits set forth, the two duties set forth by the shalls in the language after the comma? And Congress spoke to that directly in the language before the comma. All derivative beneficiaries who have gone through the H-1 formula and whose age is determined to be over 21. Now, the government's claim of ambiguity here depends on asking the Court to read one of the benefits after the comma, automatic conversion, in such a narrow and limited way, a way not required by the plain language, a way that even the BIA actually did not adopt, but such that it is incompatible with the broad scope set forth before the comma. The Court should be very suspicious of that reading, because it is exactly the contrary of the traditional tool of statutory construction, going back to Brown v. Williamson and FTC v. Mandel, that says the Court reads a statute holistically as a harmonious whole. For the government's argument to work, the Court would have to be satisfied that we were in a situation like National Association of Home Builders v. Defenders of Wildlife, which is the only case that they cite for their ambiguity claim, but there the Court faced two different statutes, enacted at different times, that were clearly contradictory. You could not comply with both of them at the same time. You had to pick one or the other, and in that context, this Court said, that opens the door to agency interpretation. So in order to be fair to the government's argument, the Court would have to be satisfied  of Wildlife, which is the only case that they cite for their ambiguity claim, but there the Court faced two different statutes, enacted at different times, that were clearly contradictory. You could not comply with both of them at the same time. So the way this works, you don't have to file a new petition? That's common ground between us. Automatic conversion means that the old petition is deemed to have been approved in a different category. But under her theory, the petition is still coming from the same person. Under yours, it would be coming from a different person. How can you even know that that person now wants this new adult to come in? Much less go ahead without a petition from that person. Well, a couple of points on that, Justice Scalia. First of all, if in the highly hypothetical situation that you have a parent who has immigrated and does not want an aged-out child to come and join them in the United States, then it is easy for the parent, the lawful permanent resident parent, to withdraw a petition. Also, the child cannot immigrate. You're going to file a petition in that person's name, without that person's consent? Well, the immigration, the ultimate moment of immigration when the child comes in, cannot happen without the parent's consent. The parent, under a provision that the government cites. And you're saying that this automatically gives the consent of that parent? No, I'm not saying that, Justice Scalia. Well, you must be, if it can automatically convert. The conversion can happen to a petition in the F2B category. But in order for a visa actually to be given and for the child to immigrate, the — first of all, the child would have to provide proof that the parent is in fact a permanent resident, and would also have to provide an affidavit of support under a provision that the government cites in its reply brief, agreeing to support the child so that he or she does not become a public charge. That can't happen without the consent of the petitioner. So if there ever were a situation. I'm sorry, Justice Kagan, but I was just going to finish the thought. That if there ever were to be a highly hypothetical situation where the converted petition put into the position of Petitioner someone who did not want the child to come in, there are plenty of off-ramps that that Petitioner can take in order to avoid that outcome. So that is not an impediment to our argument at all. Kagan in the usual case, the Petitioner has to show a bunch of things, right? You have to come in and say I'm a legal permanent resident, and, you know, I file an affidavit of support and show that you haven't committed any offenses against minors and all of this stuff, right? So, but you're suggesting that we can just ignore all of those requirements that usually have to be shown at the threshold for a petition to be accepted. Isn't that right? That's not right at all, Justice Kagan. Certainly not that they have to be ignored. There is an adjudicated petition on file by the U.S. citizen relative. But in order for the child to immigrate, the petitioner, the new Petitioner, the lawful permanent resident parent, has to meet all those requirements which are assessed at the moment that the child's visa application is adjudicated. That is also when the determination of the age happens under the child status  Sotomayor, is that for F2A children as well? These steps, are they applied to F2A? Derivatives? Yes. Who age out. And not derivatives. I'm talking about the children of spouses. Every, every, every. Yes, Justice. The answer is yes, Justice Sotomayor. Everything immigrant to U.S. Everything happens at the visa issuance moment. At the visa application stage, the officer who is adjudicating the visa application has to ensure the qualifications of the Petitioner to make sure that they actually are a U.S. citizen or permanent resident entitled to petition, and the qualifications of the beneficiary to make sure that they have met all the requirements. Direct or. Yes. Derivative or principal, whether inside the United States or outside. So you're saying that these things would happen, do I understand you correctly, these things or most of these same things would happen in the cases in which the government says there is automatic conversion? Most certainly, Justice Alito, yes. That is exactly right. And the issue of time – I mean, I think maybe it's worth backing up and talking about how we think automatic conversion is supposed to function. What happens is you have the Petitioner originally filed, it gets approved, and then they wait until the visa number becomes current, and then they each, each beneficiary has to file a visa application which gets adjudicated. Now, that can be adjudicated in one of two ways, depending on whether the beneficiaries are in the United States or outside. Notably, if the beneficiaries are inside the United States, they go through adjustment of status, and there is no claim on the government's side that there is any obstacle to automatic conversion at that point. Why is that? Because they both go in at the same time, parent and child. The officer always adjudicates the principal beneficiary's file first. It will approve the application, and then the parent becomes a lawful permanent resident on the spot. And then nothing prevents the officer from looking at the child and saying, well, I'm doing the H-1 calculation, your age turns out to be over 21 under this formula. Nonetheless, I can treat your petition as automatically converting to F-2B because you are the adult son or daughter of a newly minted lawful permanent resident parent who is sitting right here. No difficulty at all, certainly no impossibility. Kagan. Kagan Mr. Fleming, to accept that argument, don't you have to accept your understanding of what the appropriate date is? I mean, let's suppose that the government is right, that the date is the one that's actually specified in the statute which says the date on which an immigrant visa number becomes available. At that date, the parent is not even going to be a legal permanent resident. Isn't that right? Fleming So to answer to that, Justice Kagan. First of all, your question to Ms. Goldenberg was completely right, which is that that is not the approach that the Board of Immigration Appeals took in Wang. The Board thought, wrongly, and the government now does not even try to defend it, that the conversion had to happen, if at all, at the date that the at the moment that the beneficiary aged out. That's what they say. They say, we look to see which category the petition converted to at the moment the beneficiary aged out. That's on page 35. They tried to defend that in front of the Congress. Kagan But let's assume that this is the right date, the one that's actually specified in the statute. Can you win if that's the right date? Fleming It is — well, we don't think that is the right date. Kagan I know, but can you win if it is the right date? Fleming Well, I think at that point, the question then becomes, does the conversion have to happen immediately at that time, or as long as it's converted at some point in the future, are we still interpreting the statute in a harmonious way? Automatically, it doesn't have to mean immediately. Now, we think it can mean immediately, if that's how the Court chooses to interpret it, and still win, because we think the determination happens when the adjudication happens, which is when, under their current procedures, they do the age calculation. But even if the Court disagrees with me on that and thinks that the statute requires the determination to happen sooner, all that means is at some point after the determination, the petition shall be converted. But that doesn't mean it has to be done right at the time of the determination. I'd like to back up, though, and take on the premise of the question, which is that H-1 somehow says that the conversion in H-3 has to happen on the date that the visa becomes available, because that's not what the statute says. H-3 does not say that the conversion has to happen on that date. It could have said that. There are regulations in 204.2i that specify when the conversion happens, as of a particular time or upon a particular occurrence. Congress could have taken language like that and put it into H-3. It didn't. All that H-1 is doing is setting out the particular formula that gets applied to determine the age of the derivative beneficiary for purposes of subsection D. And it sets it out by having a two by setting up two numbers that get subtracted. The first number is in H-1a. The second number is in H-1b. And the first number is the age of the child on the date the visa became available, and that is reduced by the number in b, which is the number of days that the petition was pending. Nothing in H-1 says you have to do this calculation at a particular time. It just says when you do this calculation, here are the numbers you use. But the determination itself is a matter of agency procedure. And under their current procedures, it's not disputed, what happens at the time after the visa application has been filed and it is ready for adjudication, when the officer sits down, whether it's a State Department consular officer outside the country or a CIS officer in the country, sits down with the applicant and makes sure that all the eligibility criteria are met, including this one. Breyer, can I try an example, because I find it easier to. Sotomayor, imagine Stephen is a citizen. His brother, Charles, is not. So under 4, and Charles has another, has a son, Joseph, who is not. That will help me think about it. So we are under F-4. Stephen files a petition. The beneficiary is Charles. Charles has a minor son, Joseph. Visa is granted, et cetera. He's given, everything is in order, and now Charles has to wait about 10 years or so. And by the time he gets, at the time his number becomes current, the number becomes available for the alien, namely for Charles. At that moment, we calculate Joseph's age, and it's 24. So your idea is that Charles is current, everything is fine, he gets his visa, he's married, he goes to the port or the office, wherever he's supposed to go, and he brings Joseph with him. At that point, Joseph, since he's no longer a child, has to come in under another category, and that category is going to be, I guess, 2B, because Charles will be now an LPR and Joseph will be unmarried over 21, right? Am I right so far? I'm uncomfortable referring to Your Honor by your first name or your brother by his first name. This is an imaginary, he spells it with a V. But Your Honor has it right. Okay. Now, if I have it right. With one tweak, which is, I think you're positing that your brother and his son are outside the country, not going through adjustment of status, where the situation is a bit different, because then your brother could become a permanent resident and immediately there's no problem with going to a port. Okay. But for consular processing, I think what would happen is you, when you go to the consular office, Judge Breyer's application would be accepted, and the calculation would be done for the son, and it would be, all right, you now no longer qualify as a derivative, because you're 24. But there is one thing missing. Charles has not filed a petition for Joseph. So what do we do about that? What happens then is what can happen already under the agency procedures, which is they deny Joseph's application without prejudice to reapplication within a year, which they can do. They do it already. Judge Breyer immigrates to the United States. He goes up to the port. He is admitted as a lawful permanent resident. And the moment that happens, and the moment Joseph gets proof of that happening, he goes back into the consulate and says, all right. Breyer, doesn't Charles, as a lawful permanent resident, have to file a piece of paper called a petition in which Joseph is main primary beneficiary? I mean, obviously, we have two arguments on this. Our principal position is no, because at that point there can be automatic conversion from Your Honor's petition with respect to an F2B petition on behalf of Joseph. There is no F2B petition because Charles never filed it. I mean, yeah, right. You don't need a piece of that's what automatic conversion is. That's what I want to know. You don't need a piece of paper. You don't need to file a piece of paper. We do all this hypothetically. It's done constructively, and that's what automatic conversion is. The petition is deemed as though it had been filed for purposes of a different category. And even in the situations where the government agrees it applies, the F2A case, not only the category changes, the principal beneficiary changes. Because the original F2A petition was for a spouse, it converts to an F2B petition for the child or the aged out child. There is no reason now the government asserts that there is something in the nature of the word conversion that makes it impossible for the petitioner to change, that that is somehow a barrier. Now, there is no reason to think that that's the case. First of all, the BIA never said that that was the case. When the BIA talks about the meaning of conversion in the Wang opinion, it says that conversion is used when, quote, a visa petition converts from one visa category to another, not a problem here, and the beneficiary of that petition then falls within a new classification without the need to file a new visa petition. Nothing about the identity of the petitioner, and conversion just means a transformation. There is no reason that a change, which can already, the government agrees, involve a change to a different category for a different principal beneficiary, can also involve a new, a change in petitioner. Conversion isn't defined in the Act's glossary. The INA has a detailed glossary in section 1101. Conversion isn't given a special meaning. The identity of the petitioner is not mentioned in H-3 at all, unlike the preexisting regulation, Justice Sotomayor, which clearly did say that a new petition has to be filed and it has to be filed by the same petitioner. Scalia, if I understand you, the parent will be deemed to have filed a petition for admission of this now adult, right? That is correct, Your Honor. And, but the parent can withdraw that petition? If he or she would ever wish to do so, yes. And the child cannot immigrate without the parent taking additional steps, most notably the filing of an affidavit of citizenship. If all of this flows from the word automatic? This, from the phrase automatic conversion, yes. And the fact that Congress, in the opening clause, before the comma of this provision, made very clear that it is to apply to all derivative beneficiaries, because it says if you go through the calculation of H-1, which everyone agrees, even the vacated panel opinion in the Ninth Circuit agreed with this, and even the government agrees, that H-1 applies to all derivative beneficiaries. And if you go through that calculation and your age is still over 21, when you come through it, then your petition shall automatically be converted to the appropriate category. And if, for some reason, Justice Scalia, the parent has a problem with that, there are plenty of ways for the parent to stop the immigration of the child, although I've never heard of a situation where that might actually happen. One thing I would like to back up to, just because we are at Chevron Step 1, and one of the issues that this Court indicated in Brown v. Williamson is important for that analysis, is a modicum of common sense as to the manner in which Congress would have been likely to delegate this particular question to the agency. The question here isn't some interstitial matter or some filling of a gap that Congress is not likely to have turned its mind to. It is a foundational question. Who gets the benefit of these mandates after the comma, the automatic conversion and the retention of priority date? It's unlikely that Congress didn't think about something as basic as that. And if they did mean to delegate that to the Board of Immigration Appeals, it's a very strange way of doing it. Because they still go away. Kagan in another understanding of Chevron is that sometimes Congress writes confusing statutes that point in two different directions at once, and then there's a choice. Does the Court make the best of it or does the agency make the best of it? And the agency knows a lot about the subject matter, and especially this agency. And so irrespective of whether Congress meant to delegate something in some very self-conscious way, this is a confusing statute. It's kind of a model. The agency gets to do it. I would certainly agree, Justice Kagan, as a general matter, that the immigration law is confusing. But I don't think it's any more confusing than other statutes where this Court has worked through it and found the ultimate provision at issue, to be clear, on the question at issue. And here the question is who gets the benefit of it. And we have an opening clause that is undisputed in its meaning that covers all derivative beneficiaries. We also have benefits, automatic conversion and retention of priority date, that clearly can be applied, possibly, not only possibly, but easily, to the full scope set out in the clause before the comma. And we have an omission, presumably deliberate, of specific limitations not only in the regulations, but also in the v. visa provision which we cite, which specifically call out the very group that the government now is trying to favor. If Congress had meant to say this only goes to F2A beneficiaries, it had two very easy examples of how to do that. It deliberately, presumably, chose not to do that. As the Fifth Circuit observed and as the questioning earlier in the argument indicated, if all that the Congress was trying to do here was codify an existing regulation, it was very easy for them to say so. But this is an ameliorative provision. Even the BIA acknowledged that. They were trying to solve a problem that happened when people had been waiting for a long period of time, and not just the beneficiary, but also the – but not just the derivative beneficiary, but also the principal beneficiary. I mean, the lead Respondent in this case, Rosalina Cuellar de Osorio, had been waiting a long time to emigrate with her husband and her family. And then when the time came, she was told, you can all go except Melvin, because he happened to turn 21 four months before the visa number became available. Congress recognized that was a problem and tried to fix it. And they did fix it, clearly. That is the common sense reading of this provision, that the clear language up front before the comma sets out the scope, and that Congress meant the remainder of the provision to be read consistently, harmoniously and holistically, as this Court has said it always does, with that scope, not to read it in tension, in some kind of irretrievable hostility with itself, which is the argument that the government needs to convince this Court of in order to even get to Step 2. Now, of course, we do have an alternative argument with – which is, you know, independent. Even if this Court were to agree that our Respondent's children are not entitled to automatic conversion, although we think they clearly are, then at the very least there is another way to read the statute harmoniously, which is that they are entitled to the retention of priority date. That is the main benefit that is provided by H-3. It's the benefit that is mentioned in the enacted title of the statute, and it's all that's needed to affirm the judgment here. And again, remember the standard. All we need to show for our purposes to affirm the court of appeals is that the language after the comma can be read in a way that is consistent with the language before the comma that sets out the broad scope of the provision. It's at least possible to read the retention language as an independent benefit. Congress repeated the word shall, meaning that it is an independent mandate. The object of the mandate is different. It is the alien who retains the priority date, whereas it's the alien's petition that is converted. And we know from Ron Payer that a statute that says that there is a duty to do A and a duty to do B can be at least read reasonably and possibly to require that you do it. Scalia, I thought it's the agency that we defer to. If it can be read in the way the agency wants, we affirm the agency's position. You're saying that that's not true, that if it can be read the way the court of appeals would like it to be read, we must affirm the court of appeals. This is a very important question, Justice Scalia. I want to make sure I've been clear. It sure is. I've never heard of that. Absolutely. No, what I've been trying to note is the fact that what we're talking about here is a statute that the government is trying to argue is hopelessly internally inconsistent. That is a step one argument that we think gets rejected at step one because the statute can be read holistically and harmoniously. And if there is any possible reading, this is the language of Brown and Williamson and NFTC v. Mandel, if the benefits after the comma can be read in a way that is consistent with the broad scope that Congress said this statute is to apply to, that is the reading to be given. Now, this is a bit of a problem. Scalia, that would depend entirely upon how much weight you want to give to the word automatically. I frankly find it hard to think that all the things that you say are going to happen flow from the word automatic. And once you have a more narrow view of automatically, it is your holistic argument does not carry the day and you're left with an ambiguity that it seems to me we would defer to the agency on. Not to the Ninth Circuit. I'm not seeking deference to the Ninth Circuit by any means, Justice Scalia. I'm seeking deference to Congress and its plain language. And that's precisely the point. Now, going back to automatic, since Your Honor wanted to focus on that, I mean, automatic just means it happens without any further interaction by the alien. All it means in the regulations is that the agency regards the petition as being approved in a different category. And that certainly can happen in our case. The government doesn't actually dispute that it happens in the adjustment-of-status context. They just argue that somehow the difference in Petitioner is relevant. Kennedy, suppose everybody knows that for the group that is covered by the Ninth Circuit's opinion, the nephews, that there's going to be a 3- or 4-year wait. Doesn't a new petition have to be filed so that BIA knows that this person is in line? What fundamentally happens is that the petition gets filed by the U.S. citizen relative, and then after it's approved just by basically checking that the relative is entitled to file that petition, then everybody waits until the petition becomes the priority date of the beneficiary becomes current, according to the State Department lines. It's not as though there's a constant re-updating to see if anyone has aged out or anyone has naturalized or anyone has gotten married or anything like that. If somebody wants to do that, then obviously they can send something in. But it's not as though there is a continuous updating of the file until the time comes when a visa application is submitted. And when a visa application is submitted, then it is adjudicated, and then all of these things are checked, and the determination of age under H-1 happens, and that is the point where the automatic conversion is going to happen. And as long as that happens while the parent is already a lawful permanent resident, there is no obstacle to conversion and no obstacle to it being automatic, because nothing else needs to be done. All that has to happen is the officer has to regard it as having been approved in the F-2. Breyer. Can I ask you a quick question? Yes. Your alternative argument, you and Justice Scalia. I take it your argument is, look at the words. The part before the comma defines a group, and that group is not in dispute. It's all the F derivatives. Yes. All right. Then look at the first part. It says the petition shall automatically be converted. Yes. You say, if I lose on that, then look at the second part. It says the alien shall retain the original priority date. And you say, as to that, that has an independent life. That's the B. So it's either A or B, and we think we win on A and B, but if not, we at least win on B. Now, has the agency ever expressed a view in respect to whether you are right or wrong about your independent B? I don't think so. So wouldn't the right thing to do there, B, in respect to B, send it back to the agency so that they can express a view in respect to that? I think that's certainly an issue. How can you possibly qualify for B without qualifying for A? How can you retain your original priority if you have not been converted to another category? It's quite impossible. The two are obviously conjunctive and not disjunctive. The way the government has been applying this provision since its enactment for over 10 years, Justice Scalia, has been to require everybody, even the people the F2A beneficiaries whom the government is now contending are entitled to automatic conversion, it has required them to file, to get a new petition filed. It has been denying automatic conversion to everybody, and it did that up through the filing of our red brief. It was only after we pointed this out a week before the government filed its reply brief in this Court, CIS issued new guidance saying, okay, henceforward, you don't need to file a new petition anymore. As far as I know, for consular processing cases, they're still doing it the old way. You still cannot get automatic conversion, but you do get to retain your priority date. They are clearly implementable as separate benefits. That is how this has been done over the last 10 or 11 years until the government came time to file its brief, its reply brief in this Court. Scalia, well, all that proves is that you need either automatic conversion or the filing of a separate petition. But you obviously need either one or the other of those two. Yes. Before the B part, the alien shall retain the original priority, makes any sense. We don't disagree with that, Justice Scalia, but we have new petitions that were filed as a protective matter in these cases. That's not a problem. These be precisely because the government was requiring everyone to file a new petition, all of the Respondent's children in this case have F2B petitions pending. We don't think we need them. Our primary argument is they should have had the original petition converted. But if for some reason this Court disagrees, we have F2B petitions there as to which the priority date can and should be retained. So either of these is a sufficient basis to affirm the court of appeals. I haven't spoken much about Step 2 of Chevron because I think it can and should be resolved at Step 1. But I would like to address the question that the response that was made in response to Justice Ginsburg's question at the beginning. The point about the categories here, it is a natural phenomenon of these categories that they are fluid. People are coming in and out of them at various times, depending on naturalization, on marriage, on termination of marriage, as people adopt children, as people decide not to immigrate, as people pass away. There is these aren't hermetically sealed categories. Also, there is no way to apply H-3 without some kind of movement. Even the government's theory of H-3 means that some people are going to go out of the F2A category into the F2B category. And so the question is, under Chevron Step 2, which, again, we don't think the Court needs to address, has the BIA drawn a rational line here within this group of beneficiaries who are all F2B, all children of lawful permanent residence? And the line the BIA drew is it says we are going to treat better people who have two lawful permanent resident parents than people who have one lawful permanent resident parent, often two, and a U.S. citizen relative. Is there a rational line for that? The BIA certainly hasn't provided one. Roberts. Thank you, counsel. Ms. Goldenberg, 4 minutes. Goldenberg. Thank you, Your Honor. The Respondents were trying to put far too heavy a burden on the government in this Chevron deference case. So long as the agency has arrived at a reasonable reading of this very complicated statute, the agency is entitled to deference here. And the Respondents' idea that some kind of internal inconsistency is absolutely required here is wrong. Automatic conversion, the phrase about automatic conversion is ambiguous, and it renders the whole provision ambiguous. And let me address the idea that everyone before the comma, everyone in the if clause of Section 1153 H-3 necessarily qualifies here. That's not true under Respondents' own reading, and it can't be true, because there are going to be situations where someone has their age calculated as over 21, as of the date the visa becomes available to the parent, and the parent never becomes a lawful permanent resident. They don't qualify. They come to the border and they are not let through the border. And so in that situation, there are going to be people who are named in that first part of the clause who are not entitled to automatic conversion. But what he's saying is that's true of everybody. Yes, Your Honor. Sotomayor, at FBA, any of these categories don't get converted until the visa is actually issued. No, but that's not true. Until you go to the consular order office and apply. That's true no matter what. It's not true with respect to F2A derivatives, because they have an existing relationship with the existing Petitioner. They don't need the primary beneficiary to become a lawful permanent resident in order to get automatic conversion. But the broader point is that we are talking about some of these cases. They can come in before their parent? No, it's not that they can come in. Their parent has to become a citizen, and then they can come in, correct? Yes, Your Honor. But they don't have to get automatic conversion. They are not relying on that new lawful permanent resident. They are relying on their existing relationship with somebody else. But the broader point here is we aren't necessarily talking about a subcategory of people who are named in that if clause who are going to benefit from automatic conversion. There's another example as well in the diversity visa context. Diversity visas don't have priority dates. So it's awfully hard to see that derivative beneficiaries of diversity visas who are named in the H-2 definitional section are going to be able to necessarily benefit from Section 1153 H-3. And even if you did think that everybody had to sort of run through the 1153 H-3 analysis, the answer you would come up with with respect to certain people is it's a null category. There is no appropriate category for them, so the category is nothing. I'd like to talk a little bit as well about the retention issue that Respondents discussed. And the implication of Respondent's argument is, as I think Justice Scalia recognized in his question, that somebody can get a priority date and just walk around with it, even if there is no valid petition pending as to them and even if their parent never becomes a lawful permanent resident. So that would mean that aged out derivative beneficiaries under Respondent's interpretation would be better off than children whose parents never become a lawful permanent resident. They would have a priority date somehow in their pocket that they could walk around with and use 20 years later when somebody filed a different petition on their behalf, an employment petition. Roberts. Roberts. It's not so odd to say they've got a priority date in their pocket when the statute says the original priority date, they'll retain the original priority date. Yes, but the statute is most reasonably read to say, as all other automatic conversion provisions do, that they retain the priority date if the automatic conversion is possible, so that there is a specific petition being identified that that priority date is going to attach to, and not that you just somehow have a priority date, which is, keep in mind, a filing date that you're just going to kind of hold and walk around with and you never become a lawful permanent resident. Well, but in a situation in which the parent never becomes a lawful permanent resident, that would mean, that would turn the notion of a derivative beneficiary upside down. That would mean that someone could, in effect, be a derivative beneficiary and use that priority date in the future, even if their parent never becomes a lawful permanent resident. Sotomayor, I'm sorry, Your Honor. On this argument, it's an original date, basically, to the original petition, meaning there has to be, it is that that's being converted. If that hasn't been granted, there's nothing to convert. If that person hasn't become a citizen, there is nothing to attach any change to. But Respondent's argument is that you don't need automatic conversion, that retention of priority date is a separate benefit. You're talking about his second statute. Exactly. And I think you just explained exactly why that can't be right, because you do need something to attach a TR. You're only talking about his second. Exactly. But I would like to go back to automatic conversion, if I could, just make a few more points. And one is that the idea that Wong didn't say that the Petitioner couldn't change. Finish that sentence. Thank you, Your Honor. The idea that the board in matter of Wong didn't say that the Petitioner couldn't change is simply wrong. The board very, very clearly on page 35 of its decision says that conversion means that you don't need a new Petitioner. Thank you. Thank you, counsel. The case is submitted.